```
                                          FILED
                                  DISTRICT OF WYOMING
                                  U.S. DISTRICT COURT

                                     JUL 01 2016

                                 U.S. MAGISTRATE JUDGE
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

UNITED STATES OF AMERICA,

                              Plaintiff,

vs.                                                     Case No: 5:15-PO-00913-MLC

KURT LOHMEYER,

                              Defendant.

---

## ORDER ON MOTION TO SUPPRES

This matter comes before this Court upon the Defendant's *Motion to Suppress all Evidence.* An evidentiary hearing was held on June 16, 2016. The United States was represented by Francis L. Pico, Devon Beeny and Max Rerucha. Defendant was represented by Linda Devine. During the hearing the government presented the testimony of National Park Service Ranger James Syvertsen and two videos which were admitted by stipulation.

### FACTS AND BACKGROUND

During the evening hours of September 7, 2015 the National Park Service conducted a traffic safety checkpoint within the boundaries of Yellowstone National Park. The checkpoint was set up on the West Entrance Road just east of Seven Mile Bridge. The checkpoint was conducted pursuant to the written Yellowstone National Park—7-Mile Bridge Traffic Safety Checkpoint Plan. Defendant Kurt Lohmeyer,

(Lohmeyer or Defendant) entered the safety checkpoint at approximately 8:30 PM. Defendant initially challenged the procedures utilized during the Safety Checkpoint. Prior to the hearing of June 16, 2016 the Defendant advised the Court he was no longer challenging the checkpoint procedures, and that issue will not be addressed in this order.

The Checkpoint was organized so that every eastbound vehicle was required to stop and the driver had a brief conversation and observation by a law enforcement officer. In addition to looking for signs of driver impairment, the officers looked for evidence of law violations in plain view. According to the checkpoint plan, this initial contact was to be less than one minute in length and preferably thirty seconds. If the law enforcement officer identified "articulable signs of impairment or other violations" the vehicle was to proceed to the secondary screening area where further investigation could occur.

Upon Defendant entering the checkpoint he was contacted by National Park Service Ranger James Syvertsen. Ranger Syverstsen observed that the Defendant was driving a dark blue Ford F-350 pickup truck with Montana license plates. Ranger Syvertsen immediately smelled cologne and an unidentified musty odor coming from the vehicle. Upon advising the Defendant of the reason for the stop, the Defendant lowered all four of the trucks windows on his own volition and told Ranger Syvertsen that he could look around the back of the pickup cab. Immediately upon the opening of the rear window Ranger Syvertsen smelled a strong and distinct odor of marijuana emanating from the vehicle. He described this as both burnt and green marijuana. The Defendant was the only occupant of the pickup. As a result of his observations, Ranger Syvertsen

requested the Defendant move his vehicle to the secondary screening area. At this time, Ranger Syvertsen and other law enforcement officers conducted a search of the Defendant's vehicle pursuant to the detection of the odor of marijuana. The Defendant volunteered that there was a firearm in the cab of the pickup truck behind the driver's seat. A firearm was located in the area indicated by the Defendant. Throughout the process the Defendant was friendly, relaxed, talkative and cooperative. The search of the vehicle revealed a prescription pill bottle containing multiple marijuana cigarette butts; a glass jar containing green marijuana; two small plastic baggies with a trace amount of an unidentified white powdery substance; a Pepsi can with holes and burn marks which the Ranger testified was consistent with a makeshift pipe; a marijuana cigarette butt wrapped in a piece of tinfoil; and a United States Postal Service box containing approximately 50 grams of green marijuana. The suspected marijuana was field-tested and indicated a presumptive positive test for the presence of marijuana.

The Defendant provided inconsistent statements regarding his most recent usage of marijuana. The Ranger told the Defendant that he wished to conduct some field sobriety tests to determine whether the Defendant was impaired in his ability to operate a motor vehicle. The Defendant consented to performing field sobriety tests and the Ranger administered such tests, including the gaze nystagmus, heel-to-toe, and one leg stand. Ranger Syvertsen observed that the Defendant's pupils were constricted and his eyes were red. He also noted unusual eye movement during the gaze nystagmus test. The Ranger did not observe sufficient adverse performance of the field sobriety test to identify impairment, but testified that he was not qualified or trained in the recognition of

3

drug impairment. Present at the Safety Checkpoint was Police Chief Scott Newell of the West Yellowstone Police Department who is trained to perform drug recognition examinations. Chief Newell conducted a preliminary lack of eye convergence test on the Defendant which indicated evidence of drug intoxication. Following that test, the Defendant was informed that a drug recognition evaluation was necessary which would require the Defendant to be transported to the West Yellowstone Police Department. The Defendant was informed that he did not have a choice in this matter and the parties agree that the Defendant was arrested at this point.

The Defendant was transported to the West Yellowstone Police Department in a law enforcement vehicle and underwent a drug recognition evaluation conducted by Chief Newell. Following the completion of the drug recognition evaluation a blood draw was obtained from the Defendant. Chief Newell did not read or proved a written consent or implied consent advisement to the Defendant and at no point was the Defendant advised that he could refuse the test. The Defendant remained cooperative and did not object to the test. The field sobriety test and the drug recognition evaluation were digitally recorded and those recordings were admitted into evidence by stipulation during the suppression hearing[1].

The Defendant remained in custody until his appearance in this Court on September 8, 2015. The Defendant enter guilty pleas to charges of being in possession of a controlled substance and to possessing a firearm in violation of state or federal law. He

---

[1] Exhibit # 1 is the recording of events at the West Yellowstone Police Department and Exhibit # 2 is the recording of events at the traffic safety checkpoint.

entered a not guilty plea to the driving under the influence charge and subsequently filed a motion to suppress evidence, including the results of the blood test.

## DISCUSSION

The Defendant originally sought to suppress the evidence on three basis. First, that the original stop was result of an unlawfully conducted safety checkpoint. Second, that the Defendant's subsequent detention at the secondary inspection site and the West Yellowstone Police Department was unlawful. And third, that the extraction of the Defendant's blood was an unlawful search. The Defendant withdrew his challenge to the safety checkpoint procedures prior to the hearing on the motion.

**DETENTION OF DEFENDANT**

The detention of the Defendant requires reasonable suspicion, *Terry v Ohio*, 392 U.S. 1, 88 S.Ct 1868 (1968) and its progeny. The Defendant argues that Ranger Syvertsen did not have sufficient reason to believe he was an impaired driver. The defense does not address the fact that the Ranger had detected the odor of an unlawful drug within the vehicle. When Defendant was directed to the secondary screening area law enforcement had a reasonable suspicion regarding the presence of marijuana based upon the observations of Ranger Syvertsen. The continued detention of the Defendant at the secondary screening was based upon the reasonable suspicion that illegal drugs were present in the vehicle.

The Defendant does not challenge the search of the vehicle. The Tenth Circuit has recognized that the presence of the odor of marijuana alone is sufficient to provide probable cause to support the warrantless search of a motor vehicle. *United States v.*

*Morin*, 949 F.2d 297, 300 (10th Cir. 1991). "The smell of burnt marijuana would lead a person of ordinary caution to believe the passenger compartment might contain marijuana." *U.S. v. Nielsen*, 9 F.3d 1487, 1491 (10th Cir. 1993). "[T]he smell of burnt marijuana is generally consistent with personal use of marijuana in the passenger compartment of an automobile." *U.S. v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998). The initial search of the Defendant's vehicle was justified by Ranger Syvertsen's recognition of the smell of marijuana. That search revealed evidence of both burnt and green marijuana. As such, the continued search of the pickup bed was justified. *U.S. v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998). In this matter the search was also with the uncontested consent of the Defendant.

The Defendant was requested to undergo field sobriety tests. A request to conduct field sobriety tests need only be supported by a reasonable suspicion of intoxication. *Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007). Reasonable suspicion is not "an onerous standard." *U.S. v. Kitchell*, 653 F.3d 1206, 1218 (10th Cir. 2011). It is the government's burden to show reasonable suspicion. The government must make this showing by a preponderance of the evidence. See *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012) ("The Government bore the burden before the district court of establishing by a preponderance of the evidence that reasonable suspicion supported the officer's stop of Defendant's vehicle.").

Reasonable suspicion only requires the officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity. *U.S. v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004). Reasonable suspicion exists even if there is also a

possibility of innocent conduct or even if it is more likely than not that the individual is not involved in any illegality. *Id.*.

In this matter, the government contends that the totality of the circumstances supports the Ranger's request to continue the detention for the purposes of conducting field sobriety test. The testimony during the hearing established that the Defendant was the sole occupant of the vehicle in which the Ranger detected the odor of both burnt and green marijuana. As noted above, the presence of burnt marijuana, as revealed by the Ranger's observations and the subsequent search of the cab of the pickup, is consistent with personal consumption of the marijuana within the vehicle and supports a reasonable suspicion on the part of Ranger Syvertsen that the Defendant may be under the influence of marijuana. Therefore the continued investigatory detention for the purposes of conducting field sobriety tests was proper.

Following the field investigation the parties agree that the Defendant was arrested, even though he was never told that he was under arrest. Defendant asserts that the arrest was unlawful in that it was not supported by probable cause. "Probable cause to arrest exist if, the facts and circumstances within the officers knowledge are sufficient to justify a prudent officer in believing the defendant committed or is committing an offense." *U.S. v. Stephenson*, 452 F.3d 1173, 1178 (10th Cir. 2006).

> Probable cause is a matter of probability, not certainty. Probable cause requires 'only a probability or substantial chance of criminal activity, not an actual showing of such activity.' *Illinois v. Gates*, 462 U.S. 213, 243 n.13, 103 S.Ct. 2317 (1983). Because a 'fair probability' is all the law demands, we do not require 'greater proof-certainty not conclusive proof-of any particular factor establishing probable cause.' *Jurado-Vallejo*, 380 F.3d at 1239.

7

*U.S. v. Stephenson*, 452 F.3d at 1178.

At the time of arrest, in addition to the discovery of partially consumed marijuana cigarettes within the cab of the pickup, Chief Newell, who is certified in drug detection, had conducted a lack of convergence test upon the Defendant. That test revealed the Defendant could not focus on a point of concentration and there was a "button hooking" eye movement which is an indication of potential drug intoxication. When dealing with potential drug intoxication the reliable indicators available to a law enforcement officer in the field is more limited than with alcohol intoxication.  The complete drug recognition evaluation requires a more controlled environment than typically present at a traffic stop[2]. Based upon the totality of the circumstances and information known to the law enforcement officers at the scene, the officers had probable cause to extend the detention of the Defendant to an arrest.

**CONSENT TO SEARCH**

The final issue raised by the defense concerns the lack of proper consent to a blood test. The Government asserts that both implied consent and actual consent exist in this matter. The Court will address implied consent first.

**IMPLIED CONSENT**

Yellowstone National Park falls within the special maritime and territorial jurisdiction of the United States and therefore 18 U.S.C. §3118 is applicable which reads:

---

[2] *Expert and Opinion Testimony of Law Enforcement Officers Regarding Identification of Drug Impaired Drivers*, 23 U.Haw.L.Rev. 151 (2000), *The D.R.E.: Drug Recognition Expert or Experiment?*, 69 UMKC L. Rev. 557, see also *State v. Daly*, 775 NW.2d 47 (Neb. 2009).

(a) Consent.--Whoever operates a motor vehicle in the special maritime and territorial jurisdiction of the United States consents thereby to a chemical test or tests of such person's blood, breath, or urine, if arrested for any offense arising from such person's driving while under the influence of a drug or alcohol in such jurisdiction. The test or tests shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving a motor vehicle upon the special maritime and territorial jurisdiction of the United States while under the influence of drugs or alcohol in violation of the laws of a State, territory, possession, or district.

(b) Effect of Refusal.--Whoever, having consented to a test or tests by reason of subsection (a), refuses to submit to such a test or tests, after having first been advised of the consequences of such a refusal, shall be denied the privilege of operating a motor vehicle upon the special maritime and territorial jurisdiction of the United States during the period of a year commencing on the date of arrest upon which such test or tests was refused, and such refusal may be admitted into evidence in any case arising from such person's driving while under the influence of a drug or alcohol in such jurisdiction. Any person who operates a motor vehicle in the special maritime and territorial jurisdiction of the United States after having been denied such privilege under this subsection shall be treated for the purposes of any civil or criminal proceedings arising out of such operation as operating such vehicle without a license to do so.

In addition 36 C.F.R. §4.23(c)(2) applies to "areas under the jurisdiction of the National Park Service.", 36 C.F.R. §1.1, including Yellowstone National Park. Section 4.23(c) reads:

(1)   At the request or direction of an authorized person who has probable cause to believe that an operator of a motor vehicle within a park area has violated a provision of paragraph (a) of this section, the operator shall submit to one or more tests of the blood, breath, saliva or urine for the purpose of determining blood alcohol and drug content.

(2)   Refusal by an operator to submit to a test is prohibited and proof of refusal may be admissible in any related judicial proceeding.

All states have similar laws in which a driver is deemed to have consented to a chemical test by the action of operating a motor vehicle on public roads and many states have made it a criminal offense to refuse to provide such test. *Birchfield v. North Dakota*, 579 U.S. at 6-7 slip opinion.  The question presented is whether this implied consent acts as a valid consent under the Fourth Amendment.  It has long been recognized that the withdrawal of an individual's blood for analysis is a search and seizure under the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834 (1966). In *Schmerber*, the Supreme Court held that a warrantless seizure of blood for purposes of determining blood alcohol concentration was appropriate due to exigent circumstances arising from the body's elimination of alcohol with the passage of time.  *Schmerber v. California*, 384 U.S. at 771, 86 S.Ct. at 1836.  This remained the law of the land until *Missouri v. McNeely*, -- U.S. --, 133 S.Ct. 1552 (2013).  In *McNeely* the Supreme Court rejected the per se application of exigent circumstances for blood draws for alcohol concentration.    Rather, the Supreme Court held that a determination of exigent circumstances must be based upon the case-by-case analysis and that "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *McNeely*, 133 S.Ct. at 1561.  In reaching this decision the Supreme Court recognized that all fifty states and the federal government have adopted implied consent laws which "impose significant consequences when the motorist withdraws consent". *McNeely*, 133 S.Ct. at 1566.  In *McNeely*, the defendant was advised of the Missouri implied consent law and refused the chemical test.  The *McNeely* Court did not

directly address the issue as to whether the legislatively supplied implied consent would act as a valid consent under the Fourth Amendment, but had the Supreme Court believed an implied consent law provides lawful consent it would have altered the finding of the court.

Following the *McNeely* decision the United States Supreme Court vacated the judgement in *Aviles v. State*, 385 S.W.3d 110 (Tex.App.-San Antonio 2012), *vacated,----* U.S.---, 134 S.Ct. 902 (2014) and remanded the case to the Texas Court of Appeals for further consideration in light of the *McNeely* decision. This is significant because the court in *Aviles* upheld a warrantless blood draw from a DWI suspect on the basis that the Texas Transportation Code authorized the warrantless seizure. Subsequently, courts have interpreted the Supreme Court's action in *Aviles* as an indication that statutory authorization of warrantless seizure of blood does not satisfy the Fourth Amendment. *Reeder v. State*, 428 S.W.3d 924, 930 (Tex.App.-Texarkana 2014). "There is no logical reason for the Court's action unless a majority concluded that Texas' implied consent statute did not justify a warrantless blood draw." *State v. Halseth*, 339 P.3d 368 (Idaho 2014). The Idaho Supreme Court went on to say:

> Considering the [United States Supreme] Court's action in *Aviles* and its reasoning and statements in *McNeely*, we hold that an implied consent statute such as Washington's and Idaho's does not justify a warrantless blood draw from a driver who refuses to consent, as did Aviles, or objects to the blood draw, as did Defendant in this case.

*State v. Halseth*, 339 P.3d. at 646.

Other courts have recently agreed that a warrantless blood draw may not be taken based entirely upon a statutorily created implied consent. In *State v. Butler*, 302 P.3d

609, 613 (Ariz., 2013) the Arizona Supreme Court, sitting *en banc*, rejected the government's argument that the Arizona implied consent statute operated as an exception to the warrant requirement of the Fourth Amendment. The Supreme Court of Delaware reached the same result when it said "the trial court erred when it concluded that 'Defendant's statutory implied consent exempted the blood draw from the warrant requirement" of the Fourth Amendment. *Flonnory v. State*, 109 A.3d 1060, 1065 (Del. 2015). The United States did not cite any authority for the proposition that a warrantless blood test may be conducted pursuant to a statutorily created implied consent. This Court finds that the Federal implied consent law does not exempt this blood draw from the warrant requirement of the Fourth Amendment.

Following the briefing and hearing on this matter, the United States Supreme Court issued its decision in *Birchfield v. North Dakota*, ----U.S. ---, --- S.Ct. --- (2016). The *Birchfield* court addressed three cases with different fact patterns. Mr. Birchfield refused to submit to a blood test for his blood alcohol content and was criminally charged with refusing to submit to the test under the North Dakota statute. Mr. Bernard refused to take a breath test after being advised that it was a criminal violation to refuse a breath test and was charged with refusal to take a test under Minnesota law. Finally, Mr. Beylund was advised of the North Dakota implied consent law, including that it was a crime to refuse a chemical test. Following that advisement, Mr. Beylund submitted to have his blood drawn.

All three cases were evaluated as searches pursuant to arrest. The Supreme Court held that a search incident to arrest will allow a breath test without obtaining warrant, but

that a blood test will require a search warrant, absent application of another exception to the Fourth Amendment warrant requirement. For purposes of the case before this Court, *Birchfield* does not alter the law. A blood test of the Defendant is not permitted pursuant to a search incident to arrest and will require a warrant absent application of another warrant exception[3].

## Actual Consent

The United States next asserts the Defendant actually consented to the blood draw. The parties agree that the Defendant was not given any implied consent advisement, advised of his ability to refuse the blood draw, or directly requested to consent. The digital video (Government Exhibit # 1) shows the drug recognition exam conducted at the West Yellowstone Police Department. At the completion of the exam, Chief Newell provides the Defendant with an advisement of his *Miranda* right and questions the Defendant regarding his drug usage. Chief Newell then says "I have to ask you for a blood test." Following further conversation about drug usage Chief Newell says again: "That's why I am going to be asking you for a blood test." At no point was the Defendant actually asked to consent. At one point the Defendant made some statements about not having a problem with coming to the Yellowstone Police Department for more tests, but never specifically indicated whether or not he was consenting to the taking of his blood. This is similar to the discussion which occurred at the checkpoint. The

---

[3] It should be noted that the *McNeely* and *Birchfield* decisions addressed testing for alcohol. *McNeely* was based in substantial part on the fact that the absorption and elimination of alcohol in the human body is well understood and predictable with some degree of accuracy. This is not as true for different drugs. It would appear this would be a proper factor for a court to consider in evaluating exigent circumstances. No evidence or arguments were presented in this case to justify the warrantless blood draw as an exigent circumstance.

Defendant was advised that law enforcement needed to conduct additional drug recognition examinations, which could not be completed roadside and that they were "going to have to take [the Defendant] into the nearest office." The Defendant responded he would go with the officers, stating, "if I have to go, I have to go. There's no other option is there?" At that time the Defendant was advised that there was no other option.

A person may consent to a search that would otherwise require a warrant under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 358, 88 S.Ct. 507, 515; *Vale v. Louisiana*, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972; *Davis v. United States*, 328 U.S. 582, 593-594, 66 S.Ct. 1256, 1261-1262; and *Zap v. United States*, 328 U.S. 624, 630, 66 S.Ct. 1277, 1280. The prosecution has the burden of proving that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792; *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367; and *Amos v. United States*, 255 U.S. 313, 41 S.Ct. 266. The determination of voluntariness must be based upon an analysis of the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048-47 (1973).

> Similar considerations lead us to agree with the courts of California that the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.

*Schneckloth v. Bustamonte*, 412 U.S. at 227, 93 S.Ct. at 2048-49.

The Tenth Circuit has provided guidance as to some of the relevant factors to be considered by the court.

> In our traffic stop cases, we have identified a number of factors that suggest that an encounter was not consensual, including the "threatening presence of several officers," the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," the "prolonged retention of a person's personal effects such as identification," the "absence of other members of the public," and the officer's failure to advise the defendant that she is free to leave. *United States v. Hill*, 199 F.3d 1143, 1147-48 (10th Cir.1999); see also *United States v. Broomfield*, 201 F.3d 1270, 1274 (10th Cir.2000). Conversely, we have pointed to other factors as evidence that an encounter was consensual, including an officer's "pleasant" manner and a tone of voice that is not "insisting," *McSwain*, 29 F.3d at 563, a public location such as "the shoulder of an interstate highway, in public view," *United States v. Soto*, 988 F.2d 1548, 1558 (10th Cir.1993), and the prompt return of the defendant's identification and papers, *United States v. Zapata*, 997 F.2d 751, 757 (10th Cir.1993). None of these factors is dispositive, however, as "a court must consider all the circumstances surrounding the encounter" to determine whether consent was voluntary. *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); see also *Hill*, 199 F.3d at 1148.

*U.S. v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006).

*Ledesma* concerned a roadside search of a van undertaken pursuant to the defendant's consent obtained after the patrolmen returned the driver's license and registration and said "thank you girls. You have a safe one." The Tenth Circuit found that the consent was voluntary based on a review of the totality of the circumstances. The Tenth Circuit has also provided further guidance regarding relevant factors in finding:

> [T]he federal test for determining the validity of consent to search requires a factual determination based upon the totality of the circumstances of whether the consent was the product of an "essentially free and unconstrained choice by [the] maker" or whether it was the product of "duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 225, 227,

15

93 S.Ct. 2041. Factors to consider within the federal totality of the circumstances test include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. See *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir.1998); *United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir.2004) (citation omitted). Whether an officer reads a defendant his Miranda rights, see, e.g., *United States v. Dozal*, 173 F.3d 787, 796 (10th Cir.1999), obtains consent pursuant to a claim of lawful authority, see, e.g., *Bumper*, 391 U.S. at 548-49, 88 S.Ct. 1788, or informs a defendant of his or her right to refuse consent, *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041, also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*U.S. v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006).

With this guidance in mind this Court must undertake a review of the circumstances involving the government's contention that the Defendant voluntarily consented to provide a blood sample. First, the Court notes that the entire encounter, as digitally recorded, shows all law enforcement officers acted in a professional and courteous manner at all times. This is not a case in which there was any physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or aggressive tones. In addition the Defendant appears to be of average intellect with full capacity to understand what was occurring. For the most part, his conversation was appropriate and relevant to the circumstances. In addition, there's no indication that any weapons were displayed at any time. On the other hand, the Defendant had been in the custody of law enforcement for well over an hour prior to the alleged consent; he had been transported from a public place to a non-public location; he was clearly aware that he was unable to leave and officers had told him that he didn't have any choice in going

to the police station for additional testing; and no officer ever advised him that he had any right to refuse the blood test. Most problematic was the fact that the Defendant was never asked if he consented to a blood draw. Chief Newell stated: "I have to ask for a blood test". Subsequently, Chief Newell starts to look through paperwork and preparing the blood sample test. At no point did Chief Newell actually seek the Defendant's consent, but acted throughout the encounter as if the Defendant was required to provide the blood sample. The totality of the circumstances establishes that the Defendant never consented to the blood draw, but rather simply resigned himself to following the directions of law enforcement. Previously at the checkpoint when the Defendant was advised that the law enforcement officers wanted to conduct a drug recognition exam at the West Yellowstone Police Department they told the Defendant that they were "going to have to take you into the nearest office" which was the West Yellowstone Police Department. The Defendant responded, "[I]f I have to go I have to go. There is no other option?" at which time he was told no.

In summary, the Defendant was advised that he had no choice but to be taken to the West Yellowstone Police Department for further testing. Then he was advised that officers were going to do a blood test, but officers never asked if he would consent to the blood draw. It is difficult to understand how the Defendant could have freely and voluntarily consented, when no consent was solicited from the Defendant. Additionally, the Defendant was not advised that he had any right to refuse the test. The circumstances would have indicated to a reasonable person that they had no ability to refuse the blood draw. Failure to actively resist is not the same as voluntary consent. Therefore, the

Defendant did not voluntarily consent to the blood test, but rather resigned himself to obeying the directions of law enforcement.  Absent a valid and voluntary consent, the blood draw was a warrantless search in violation of the Fourth Amendment.

THEREFORE THE COURT HEREBY FINDS AND ORDERS that the Defendant's *Motion to Suppress* is hereby GRANTED, evidence received as a result of the blood test are suppressed.

Dated this 1st day of July, 2016.

MARK L. CARMAN
UNITED STATES MAGISTRATE JUDGE